Filed 11/17/15  P. v. Mendoza CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E061566 |
| v. | (Super.Ct.No. SWF1208393) |
| RAUL MENDOZA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael J. Rushton, Judge.  Affirmed.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Sean M. Rodriquez, and Teresa Toreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

Michelle Rogers and Lindsey M. Ball, under appointment by the Court of Appeal, for Defendant and Appellant.

1

After the trial court denied his Penal Code section 1538.5[1] motion to suppress evidence of a shotgun found during a warrantless search of his home, defendant and appellant, Raul Mendoza, pled guilty to unlawful possession of a firearm by a convicted felon (§ 29800, subd. (a)(1); count 1) and admitted one prison prior (§ 667.5, subd. (b)) and one strike prior (§ 667, subd. (e)(1)). After the trial court adjusted for enhancements and struck the punishment for the prison prior, it sentenced defendant to 2 years 8 months in state prison.

Defendant's plea agreement preserved his right to appeal, and he now seeks reversal of his conviction on the ground the trial court erred in denying his motion to suppress by concluding: (i) the warrantless search of his home was justified as community caretaking; (ii) the warrantless search was justified by exigent circumstances; and (iii) the deputies who searched his home did not exceed the permissible scope of their warrantless search. Defendant further contends the manner in which the deputies conducted the search of his home justifies excluding evidence of the gun.

We affirm the judgment because the search was justified under the exigent circumstances exception to the warrant requirement and the deputies found the shotgun in a search suited to locating a concealed burglar.

---

[1] All further unlabeled statutory references are to the Penal Code.

# I

## FACTUAL BACKGROUND

At 4:13 p.m. on November 16, 2012, a private alarm company notified the Riverside County Sheriff's Department that a security alarm had sounded at defendant's home in San Jacinto. The sheriff's department dispatched a deputy at 4:13 p.m. and he arrived at the scene at 4:15 p.m. or 4:16 p.m. to investigate. The deputy testified at the suppression hearing about his investigation and search of the house, which the People concede occurred without a warrant.

The deputy began by inspecting the front of the house, where he saw nothing out of the ordinary. Next, he walked around to the side of the house where a wooden gate led to the backyard. The wooden gate was open, and some slats were broken "like it had been forced open." The deputy went into the backyard, where he found the screen from a rear window propped against the house and the window itself open approximately one foot.

Based on these facts, the deputy concluded "there might be someone inside that had broke[n] into the house to commit a burglary." He "radioed for an additional unit to come and assist so [they] could search the residence for anybody that might be inside." He testified his purpose for searching the house was "[n]ot knowing if there was actually somebody inside committing a burglary or if someone had broke[n] in and hurt somebody else that was staying at the house." While he waited for assistance to arrive, the deputy listened carefully for any cries for help or "any movement coming from inside

3

the residence." The deputy testified he did not hear any requests for help, indications of struggle, or noises of furniture being moved.

When two more deputies arrived, one took up a position in front of the house and the other helped conduct the search. The deputies announced themselves before entering the house. They then opened the window wider so they could fit through and climbed into a bedroom in the back of the house. Once inside, the deputies "checked each room [they] went into" and "check[ed] the closets or wherever someone might be hiding." As they went from room to room, the first deputy testified he continued actively listening for any noise, but did not hear any shouting for help, crying, struggling, or movement of furniture.

After searching the first bedroom and a hallway, they reached the master bedroom at the front of the house, which they were able to enter without force. When they had entered the room, they saw nothing of immediate concern. The bedroom contained a bed made up of a frame, a mattress, and a box spring. The deputies did not see anything protruding from the bed. The bed had sheets and blankets over the mattress and a bed skirt. When the deputies "lifted the bed skirt, [they] could tell underneath the bed skirt was a box spring" as well as additional space between the bottom of the box spring and the floor. The first deputy testified he had found people hiding under beds in the past. The second deputy lifted the bed skirt and "look[ed] under the bed and noticed that there was a shotgun lying underneath the bed." The first deputy then approached the bed, kneeled, and looked under the bed. He testified that he "could see the back end of [the gun] and could tell that it appeared to be the butt end of a gun" though he "didn't know if

4

it was a real gun at that point or not." The deputy had a flashlight, but did not remember whether he used it to illuminate the space under the bed. He took the gun out from under the bed "to verify if it was, in fact, a real shotgun."

The first deputy testified he estimated the gap between the bed frame and the floor measured six to eight inches. To look under the bed, he testified that he put "one hand and one knee on the ground and bent down to look underneath" the bed with his head "parallel to the floor." The first deputy could not describe the manner in which the second deputy had initially searched under the bed because at the time he was "covering the rest of the room" so he could "make sure that no one comes up behind [the second deputy] while he's checking something." When the second deputy announced he saw a gun, the first deputy looked over and saw that he was kneeling next to the bed.

An investigator for defendant testified he measured the space between the bed frame and the ground and found it to be five and a quarter inches. The investigator asked two members of defendant's family who were present when he visited the house to try to crawl under the bed. One was a young man five feet six inches tall who weighed 145 pounds. The other was a child about three and a half years old and three and a half to four feet tall. Neither person fit under the bed.

Defendant was subsequently arrested for possession of a firearm as a convicted felon. He moved to suppress evidence of the gun on the basis that it was obtained during an unlawful warrantless search. The trial court heard testimony of the first deputy and defendant's investigator, and ruled the search legal under the community caretaking and exigent circumstances exceptions to the warrant requirement. The trial court also ruled

the deputies did not exceed the proper scope of the search by looking under the bed for a concealed person.

After the court denied his motion to dismiss, defendant conferred with his attorney and pled guilty the same day to one count of possessing a firearm as a convicted felon. The trial court sentenced defendant to 2 years 8 months in state prison. Defendant preserved his appellate rights, and filed a timely notice of appeal.

## II

## STANDARD OF REVIEW

A trial court considering a motion to suppress under section 1538.5 is "vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally unreasonable." (*People v. Woods* (1999) 21 Cal.4th 668, 673.) Accordingly, on appeal, we defer to all factual findings, express or implied, supported by substantial evidence. (*Id.* at pp. 673-674.) However, we exercise our independent judgment in determining the constitutional significance of those findings. (*Ibid.*)

## III

## DISCUSSION

1. *Warrantless Entry of Defendant's Home*

"[P]hysical entry of the home is the chief evil against which the wording of the

Fourth Amendment is directed."[2] (*Payton v. New York* (1980) 445 U.S. 573, 585.) Thus, "searches and seizures inside a home without a warrant are presumptively unreasonable." (*Groh v. Ramirez* (2004) 540 U.S. 551, 559; accord, *Payton v. New York*, *supra*, at p. 586.) Nevertheless, "[b]ecause the Fourth Amendment's ultimate touchstone is 'reasonableness,' the warrant requirement is subject to certain exceptions." (*Brigham City, Utah v. Stuart* (2006) 547 U.S. 398, 403.) "Because the People concede that no warrant was issued . . . they have the burden to prove the warrantless entries were justified" by an exception to the warrant requirement. (*People v. Duncan* (1986) 42 Cal.3d 91, 97 (*Duncan*); *People v. Rogers* (2009) 46 Cal.4th 1136, 1156.)

The People contend the search was justified under the exigent circumstances exception to the warrant requirement. The trial court agreed. Defendant contends the trial court erred in ruling exigent circumstances justified the deputies' warrantless search because they did not have probable cause to believe a crime was in progress or that entry was reasonably required to prevent imminent harm to persons or property. We disagree.

"[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." (*Mincey v. Arizona* (1978) 437 U.S. 385, 393-394.) Under this exception, law enforcement officers may make a warrantless entry into a residence where they have probable cause to

---

[2]     We review challenges to the admissibility of evidence obtained in government searches under federal constitutional standards. (*People v. Troyer* (2011) 51 Cal.4th 599, 605; *People v. Woods*, *supra*, 21 Cal.4th at p. 673.)

believe exigent circumstances exist making entry reasonably necessary " 'to prevent imminent danger to life or serious damage to property . . . .' " (*Duncan*, *supra*, 42 Cal.3d at p. 97, quoting *People v. Ramey* (1976) 16 Cal.3d 263, 276; see also *People v. Celis* (2004) 33 Cal.4th 667, 676 ["The United States Supreme Court has indicated that entry into a home based on exigent circumstances requires *probable cause* to believe that the entry is justified"].) Law enforcement officers justify such a search by "point[ing] to specific and articulable facts from which [they] concluded that [their] action was necessary." (*Duncan*, *supra*, at p. 98.)

In evaluating the deputy's conduct, we undertake "a two-step inquiry: first, factual questions as to what the officer knew or believed and what action he took in response; second, a legal question whether that action was reasonable under the circumstances." (*Duncan*, *supra*, 42 Cal.3d at p. 97.) The People justify the search based on the fact that the deputy believed a burglary was in progress. Defendant does not contest that the deputy believed a burglary was in progress or the facts that the deputy testified to which led him to reach that conclusion.[3] Thus, we are left to decide only whether the deputy's conclusion that a burglary was in progress and justified a search was objectively reasonable in view of the specific facts known to the deputy at the time of the search.

---

[3] Even if the defendant did contest those facts, the trial court implicitly found that the deputy believed a burglary was in progress based on the alarm and evidence of a break-in. That factfinding is supported by substantial evidence and we defer to it.

Courts have repeatedly recognized that warrantless home searches are justified where law enforcement officers reasonably believe a burglary is in progress. (*Duncan*, *supra*, 42 Cal.3d at p. 98; *People v. Bradley* (1982) 132 Cal.App.3d 737, 743-744; *United States v. Erickson* (9th Cir. 1993) 991 F.2d 529, 532-533; *United States v. Singer* (8th Cir. 1982) 687 F.2d 1135, 1144 [upholding warrantless entry of residence where circumstances indicated burglary in progress]; *United States v. Estese* (6th Cir. 1973) 479 F.2d 1273, 1274 [upholding warrantless search where police observed signs that apartment door had been pried open].) As the *Bradley* court explained, "[t]here is a strong interest in protecting the public, and here, where appearances strongly indicate an attempted entry and a burglary in progress, the officers' subjective belief is not unreasonable as a matter of law." (*People v. Bradley*, *supra*, at p. 744.)

The People offer the same justification in this case, and defendant concedes that "[d]uring the course of a burglary investigation, a warrantless home entry is . . . justified when the officer has objective facts supporting the reasonable belief the burglary is in progress." Thus, the question we face is whether the facts known to the deputy at the time of the search support an objectively reasonable belief that a burglary was in progress. (*Duncan, supra*, 42 Cal.3d at pp. 97-98 ["As a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a [person] of reasonable caution in the belief that the action taken was appropriate. [Citation.]"].)

We hold that the deputy articulated specific facts that show he had an objectively reasonable basis to believe that a burglary was in progress in defendant's home. Our

9

analysis begins with the fact that the first deputy on the scene was responding to a security alarm. The sheriff's department received a call from the alarm company and the deputy was dispatched at 4:13 p.m. The deputy arrived at defendant's home within two or three minutes. Shortly after arriving, he found evidence that someone had broken into the property. Though nothing was amiss at the front of the house, the gate to the backyard was open and broken "like it had been forced open." At the back of the house, the deputy found evidence that someone had forced entry to the house itself. A screen had been removed from a window and the window was open. In our judgment, these facts, taken together, gave the deputy an objectively reasonable basis for concluding a burglary was in progress. (See *People v. Bradley*, *supra*, 132 Cal.App.3d at pp. 743-744 [holding officers reasonably believed a burglary was in progress where a neighbor reported the resident was away and officers found a glass pane broken out of door and an open window]; *People v. Parra* (1973) 30 Cal.App.3d 729, 734 [Fourth Dist., Div. Two] [holding officers reasonably believed a burglary of a business was in progress where they found front door open and unlocked after business hours].)

The facts of this case are quite similar to the facts that led the California Supreme Court to endorse a warrantless home search in *Duncan*. There, a neighbor, rather than an alarm company, notified the police that a burglary may be in progress. (*Duncan, supra*, 42 Cal.3d at p. 95.) As in this case, the police officer arrived at the scene promptly. (*Ibid.*) After finding the doors locked, the officer found a box containing a television set and other items on the ground outside an open back window. (*Id.* at pp. 95-96.) He concluded that a burglary was in progress and perpetrators remained inside. (*Id.* at p. 96.)

10

He then entered the house to conduct a search. (*Ibid.*) Once inside, the officer found no burglars, but did find a narcotics laboratory. (*Ibid.*)

Defendant attempts to distinguish *Duncan* on the basis that the deputy in this case did not find a box of possibly stolen items lying outside the open window. We do not find the difference so powerful. The box of goods seemed to show that a burglary had been committed, but it is not clear whether it better supported the conclusion that the crime was in progress or that it had been interrupted. In any event, though he did not find possibly stolen property, the deputy in this case did find affirmative evidence that someone had made a forced entry on the property. There was no such evidence in *Duncan*, and we believe it is strong support for the deputy's conclusion that a burglary was in progress. Combined with the burglar alarm and the deputy's very quick response, we hold the facts as the deputy understood them at the time were sufficient to justify a reasonable person to conclude a burglary was in progress.

Defendant contends the government must show both that a burglary was in progress and that "the officer's immediate entry was reasonably required to thwart imminent danger." We disagree. The fact that a burglary is in progress may establish on its own that the officer's immediate entry was reasonably required. (See *Duncan*, *supra*, 42 Cal.3d at pp. 97-98; *People v. Lujano* (2014) 229 Cal.App.4th 175, 183 [Fourth Dist., Div. Two] ["A burglary in progress may *constitute* an 'exigent circumstance,' as that phrase is used in Fourth Amendment jurisprudence"], italics added.) As the high court held in *Duncan*, "[i]t would have been poor police work indeed for an officer to fail to investigate under circumstances suggesting a crime in progress." (*Duncan*, *supra*, at pp.

11

98-99.)  The benchmark is reasonableness, and the People have shown the deputies acted reasonably in conducting a warrantless search when faced with what they reasonably believed to be a burglary in progress.[4]

2.  *Scope of Warrantless Search*

Having upheld the propriety of the deputies' entrance into defendant's home, we must now consider whether their search, which turned up a shotgun, was suitably limited to the purpose of the search.  Defendant contends the deputies acted unreasonably by looking under a bed for concealed suspects.  We disagree.

 "[T]he warrantless search of a dwelling must be suitably circumscribed to serve the exigency which prompted it." (*People v. Hill* (1974) 12 Cal.3d 731, 755 overruled on other grounds by *People v. De Vaughn* (1977) 18 Cal.3d 889; *Mincey v. Arizona*, *supra*, 437 U.S. 385 at p. 393; *People v. Troyer*, *supra*, 51 Cal.4th at p. 612.)  Here, the same facts that justified the deputies' entering the home justified a search of places where an intruder could be concealed, including under the bed in the master bedroom.

The deputies conducted the search because they believed that a burglary was in progress and they entered the house "so [they] could search the residence for anybody

---

[4]     The People contend the unwarranted search was also permissible under a community caretaking exception to the warrant requirement articulated by a plurality in *People v. Ray* (1999) 21 Cal.4th 464, 477 (lead opn. of Brown, J.).  The trial court accepted that justification.  Defendant contends the trial court erred because the deputies did not have a reasonable belief entry was necessary to provide aid to "an injured occupant [who] is inside the house and needs immediate medical attention."  We do not reach this issue because the search was justified by exigent circumstances.

that might be inside."**5** Before the deputies entered the home, they called out to alert anyone inside that the police had arrived and were entering. It was therefore reasonable for the deputies to think anyone who was actively burglarizing the home might have hidden to avoid arrest. When they entered the master bedroom, the deputies found a bed with a bed skirt that obscured what lay underneath. The first deputy testified that while carrying out previous police searches he had found people hiding under beds. It was therefore reasonable to think that a person inside the house who was committing a burglary and aware of the police search might attempt to hide underneath the bed in the master bedroom.

Defendant contends searching under the bed was unreasonable because there was not enough room there for a person to hide. In support of this position, he offered the testimony of an investigator who inspected the scene months later. The investigator found the space under the bed to be five and a quarter inches high. He then enlisted the help of a grown man and a child who was three and a half years old to demonstrate that the space was too small to have been a hiding place. These facts are largely irrelevant.

The question we must answer is whether the deputies acted reasonably under the circumstances and with the knowledge they possessed at the time of the search. (See *Duncan*, *supra*, 42 Cal.3d at pp. 97-98.) When the deputies entered the room, the bed had sheets and blankets over the mattress and a bed skirt covered a box spring and the

---

**5** The deputy also testified he entered the house to search for anyone who may have been injured in the course of the suspected burglary, and the People ask us to affirm on that basis as well. We do not reach that issue because it is not necessary to resolve the appeal.

space beneath the bed. Only by lifting the bed skirt could they see there was a box spring as well as additional space between the bottom of the box spring and the floor. Thus the deputies could not see whether anyone was under the bed without bending down to pull up the skirt, and it was difficult to judge how large a space the bed skirt covered. Indeed, the photographs taken by defendant's investigator make it clear the space covered by the bed skirt could easily have hidden a full grown man. It was under those circumstances that the second deputy lifted the bed skirt and "look[ed] under the bed and noticed that there was a shotgun lying underneath the bed."

It may be that no one could have fit under the bed in defendant's master bedroom. However, we do not require deputies to be correct in the judgments they make while conducting searches; we require them to be reasonable. (*United States v. Estese*, *supra*, 479 F.2d at p. 1274 ["Subsequently facts indicated that [the burglar] had made off with appellant's TV before the officers arrived. On their arrival the officers had no way of knowing this, but there was probable cause for the officers on the scene to believe that a burglary had been or was being committed and to search the apartment for the burglar"].) We hold that these deputies were reasonable to conclude they should lift the bed skirt and check the space under the bed for suspects.

Defendant also contends the deputies improperly expanded the scope of the search by kneeling to look under the bed. We disagree. "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." (*Harris v. United States* (1968) 390 U.S. 234, 236; *Kentucky v. King* (2011) 563 U.S. 452 [131 S. Ct. 1849, 1858]

14

["[L]aw enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made"].) We have concluded the deputy was entitled to lift the bed skirt and look under the bed. By lifting the bed skirt, he revealed the shotgun. The deputies therefore lawfully seized the shotgun as being in plain view during the lawful search for a burglar. (*United States v. Estese*, *supra*, 479 F.2d at p. 1274 ["The discovery of the sawed-off shotgun under the water bed in the course of the search . . . should be regarded as invoking the plain view doctrine"].)

Defendant also argues the deputies improperly expanded their search by using a flashlight to illuminate the gun. However, it is black letter law that police may use a flashlight to see what would be in plain sight if not for a lack of ambient light. (E.g., *United States v. Dunn* (1987) 480 U.S. 294, 305 ["[T]he officers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search within the meaning of Fourth Amendment"]; *People v. Chavez* (2008) 161 Cal.App.4th 1493, 1501 ["It is well established law that the observation of that which is in the plain sight of an officer standing in a place where he has a lawful right to be does not constitute a search and such observation is lawful regardless of whether the illumination permitting the observation is natural light, artificial light, or light from a flashlight held by the officer viewing the object in question"].)

Once one deputy spotted the shotgun, the deputies were entitled for their own safety and the safety of anyone else in the house to investigate further and secure the

15

weapon.  (*People v. Gallegos* (2002) 96 Cal.App.4th 612, 628, fn. 13.)  It was therefore proper for the deputies to confirm the object was a shotgun and secure it.  Those actions were reasonable, and did not improperly expand the initial search.

Defendant contends the Court of Appeal decision in *People v. Lovelace* (1981) 116 Cal.App.3d 541 supports his position that the deputies in this case improperly expanded the scope of their search.  We disagree.  In *Lovelace*, the Court of Appeal held that officers found evidence the defendant was growing marijuana only by standing in an alley and peering through gaps and knotholes in defendant's privacy fence.  The court held that the defendant had a subjective expectation of privacy that was objectively reasonable and that the officer "viewed the marijuana plants from a vantage point not expected to be used by the public."  (*Id.* at pp. 548, 554.)  The problem with the search in *Lovelace* was that the officer's vantage point "did not meet the constitutional standard of reasonableness."  (*Id.* at p. 554.)  In this case, the deputies were searching for an intruder they thought may be concealed in the house.  They reasonably concluded they should look under a bed in conducting their search.  Their vantage point in kneeling next to the bed was therefore reasonably designed to accomplish this permissible goal.

Accordingly, we uphold the trial court's ruling that the search was lawful.[6]

---

[6]     Defendant contends we should apply the exclusionary rule and suppress the gun evidence deputies obtained in the search.  (See *Davis v. United States* (2011) __ U.S. __ [131 S. Ct. 2419, 2426].)  However, the exclusionary rule does not apply because we conclude the search was lawful and did not violate defendant's Fourth Amendment rights.

16

# IV

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

CODRINGTON
J.